UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

GARY W. MUFFLEY, Regional Director of the
Ninth Region, National Labor Relations Board                          PETITIONER

v.                                                                                                  CIVIL ACTION NO. 3:12CV-80-S

PRINT FULFILLMENT SERVICES, LLC                                  RESPONDENT

**MEMORANDUM OPINION**

This matter is before the court for consideration of the petition of Gary W. Muffley, Regional Director of the Ninth Region, National Labor Relations Board ("Director"), for an injunction pursuant to 29 U.S.C. § 160(j) prohibiting respondent Print Fulfillment Services, LLC ("Print Fulfillment" or "the Company") from engaging in unfair labor practices.

Section 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j), authorizes the Director to seek interim injunctive relief, where appropriate, to preserve the status quo pending the outcome of administrative proceedings brought before the National Labor Relations Board ("the Board") to address allegations of unfair labor practices.

Specific acts are alleged in the Consolidated Complaints pending before the NLRB. This court is not charged with the duty of determining whether specific acts in fact occurred or whether any such acts constituted unfair labor practices. Indeed, we are prohibited from making such findings. Rather, in addressing the Director's motion for injunctive relief, the court must determine only whether there is reasonable cause to believe that unfair labor practices have occurred. *Gottfried v. Frankel*, 818 F.2d 485, 493-94 (6th Cir. 1987). The Director must produce some evidence in

support of a non-frivolous theory of liability.  *Id.* at 493.  The Director's burden is not an onerous one.  *Id.*  Upon a finding of reasonable cause, the court must determine, in its discretion, whether the grant of temporary injunctive relief is just and proper.  *Id.*, *quoting Levine v. C & W Mining Co.*, 610 F.2d 432, 435 (6th Cir. 1979).  The court must consider that "section 10(j) was added to give the Board a means of preserving the status quo pending the completion of its regular procedures.  [citations omitted]."  *Gottfried,*  818 F.2d at 494.  "By the same token, the relief to be granted is only that reasonably necessary to preserve the ultimate remedial power of the Board and is not to be a substitute for the exercise of that power. [citation omitted]."  *Id.*

While the petition for injunctive relief was under consideration by this court, the NLRB's initial decision issued.  That decision is now wending its way through the NLRB's appeals process.

A number of allegations have now been withdrawn.  These allegations[1] will therefore not be addressed in consideration of the petition for injunctive relief.

The NLRB found that Print Fulfillment engaged in a number of unfair labor practices.  These findings extend beyond the scope of our decision, as we make only a reasonable cause determination.  For the most part, however, this court's findings of reasonable cause coincide with the decision of the NLRB.  Similarly, the court finds that injunctive relief is just and proper in a number of respects to preserve the status quo and prevent future violations pending the final decision of the Board.

The Director filed the NLRB decision with the court.  Print Fulfillment has file a motion in which it objects to the imposition of injunctive relief on the ground that it has begun to comply, and

---

[1] The Director no longer challenges the layoff of Nicklaus Recktenwald under §8(a)(3), the shift transfers of Richard Woolsey and Travis Dykstra, the institution of a policy of disciplining bargaining unit employees for production errors, the company's delay in providing requested information to the Union, or the issuance of written warnings to Travis Dykstra.  *See,* July 7, 2012 Cover Letter (DN 22), p. 3.

intends to further comply, with the NLRB's Order. (DN 24). The Company argues that since it has been told to cease and desist in certain activities and to take certain remedial steps to remedy violations, and it intends to comply[2] with the Order, injunctive relief is not necessary. Rather, the Company would have the court simply follow up with the parties in sixty days to assess the status of negotiations. (DN 24). Print Fulfillment notes that it recalled four laid-off pressroom employees, Jonathan Bishop, Nicklaus Recktenwald, Robert Starks, and William Wellman, as ordered by the NLRB. *Id*. Apparently, only Bishop has returned at this time. *Id.*

The court finds in light of the extensive of anti-union conduct alleged to have occurred both before and after the election, that injunctive relief is just and proper, despite after-the-fact efforts by the Company to comply with the NLRB decision. The very purpose of the provision for interim injunctive relief in cases of this kind is to provide some assurance to the bargaining unit that employees' right to organize is acknowledged and will be protected.

I.

Print Fulfillment is a Louisville, Kentucky-based web-to-print company with a workforce varying during the year from 90 to 150 employees at its West Louisville printing plant. Operation of the high-tech presses used to produce Print Fulfillment's products is a skilled occupation. Prior to the October, 20011 election, none of these employees had union representation. Unionizing efforts began in June of 2011. A group of approximately twenty-one pressroom operators now constitute the new Teamsters bargaining unit which is the subject of this litigation. The events leading up to the representation vote in October, 2011 may be summarized as follows:

---

[2] Apparently with the exception of the order requiring back pay. DN 24, p. 2.

In June of 2011, a press operator, Jonathan Bishop, contacted the Graphic Communications Conference of the Teamsters seeking representation for the pressroom employees. In September 2011, a representation hearing was held on a petition filed by the International Brotherhood of Teamsters, Louisville Local 619-M seeking to represent them. A number of pro-union pressroom employees of Print Fulfillment testified at the hearing. On September 26, 2011, the organizing effort was approved.

The proponents of the Union sought to get the word out and encouraged co-workers to vote in favor of union representation. Company opposition to the organizing efforts took various forms, some of which the NLRB contends were unfair labor practices. In any event, an election by secret ballot was held at Print Fulfillment on October 28, 2011. A bargaining unit known as the Graphic Communications Conference of the International Brotherhood of Teamsters, District Council 3, Louisville Local 619-M (hereinafter, "the Union") was successfully voted in.

II.

There are many allegations concerning acts which purportedly occurred prior to the election, allegedly to discourage employees from voting for union representation. The Director seeks an order enjoining future "threats" or acts of "coercion" in connection with employees' support for the Union.                              There was evidence[3] that Company President and CEO, Brett Heap, had been opposed to the Union, was unhappy with the employees who testified on behalf of the Union at the representation hearing, and "wanted to get rid of" those individuals "if the union didn't go through." TR. 240. He discussed replacing pro-union employees in the event the union

---

[3]The evidence to which the court refers in this opinion are taken from the transcript of the NLRB hearing ("TR.") or from the NLRB Decision ("D.").

vote failed so that a year later "there wouldn't be another clamor for another union vote." *Id.* There also was evidence that, prior to the election, anti-union sentiment was expressed by a number of members of management in interactions with employees. The Director alleged, and the NLRB found, that comments by management crossed the line from non-coercive anti-union statements, permissible under 29 U.S.C. § 158(c), to the employment of threats of reprisal or promises of benefit, which constitute unfair labor practices. The NLRB further found that the Company "maintained a long-range and comprehensive overall plan to unlawfully thwart the Union's organizing efforts at [Print Fulfillment]...At its heart, the plan sought to mold and reshape the composition of the bargaining unit in order to pack it with opponents of the Union. The most obvious component of the plan was to remove supporters of the Union." D. 36.

       The court finds that there is reasonable cause to believe that management engaged in unfair labor practices in seeking to prevent unionization. There is ample evidence of hostility among upper level management toward the Union and of various intimidation tactics employed to influence the pressroom employees both before and after the October vote. There was evidence that Brett Heap was at the forefront of the effort to systematically replace union supporters. As explained by Scott Pearcy, a member of management:

> ...Brett and I talked...[a]bout...where he saw me going in the Company, what he wanted me to do...And that we had to look in and start documenting, and everything, and get all our stuff in a row that we'd have probable cause, I suppose is the best way to put it,...to let employees go who were with the Union...

TR. 247. Production manager William Morrison told various employees prior to the election, "If I know Brett [Heap] like I think I do, he won't–he's not going to sign a contract [with the Union]." TR. 949. He was also heard to repeatedly say that "if you guys think you're going to win a battle by voting in a union, you're not going to win the war." TR. 731. Additionally, there were

conversations among members of management that anyone who voted for the Union was "crazy" because Brett Heap would "get rid of them all."

Union activity declined after the election. The Director adduced testimony that some employees felt intimidated after the election and feared retribution by the Company for supporting the Union. Union meeting attendance decreased after the election, and employees did not want to be seen at the union hall. TR. 516-531.

This evidence is sufficient for this court to find reasonable cause to believe that anti-union animus existed. This and additional evidence discussed later in this opinion confirms a reasonable belief that such an atmosphere has persisted after the election. Such a hostile environment has the potential to chill the exercise of union rights by employees who may legitimately fear reprisal by the company. Injunctive relief is therefore just and proper to prohibit anti-union activity and prevent further chill.

III.

Particular post-election acts were charged as unfair labor practices by the Director. These alleged acts fall into two general categories – (1) Implementation of policies purportedly put in place in retaliation for voting in the Union, and (2) Specific acts of purported retaliation against individual Union supporters, such as being laid off, sent home, or disciplined. We will address the various allegations *seriatim*.

A.

There was evidence that on October 31, 2011, the first work day after the election, the Company called a meeting with each shift and provided a written list of rules pertaining to job performance. This list was titled "Responsibility Press Operators." (GC Ex. 2). There was evidence that employees were told that if they did not sign this rules sheet they might not be permitted to work. The rules were also read aloud to the employees. Bishop signed the rules, but indicated that he was signing "under protest." TR. 84.

The timing of the implementation of these rules, immediately after the election and prior to achievement of a collective bargaining agreement, is highly suspect. *See, Davey Roofing, Inc.*, 341 NLRB 222, 223 (2004), cited in the NLRB decision for the proposition that "the timing of an employer's action in relation to known union activity can supply reliable and competent evidence of unlawful motivation."

The Company urges that it "is not prohibited from enforcing, and does not have to bargain for, pre-existing rules." Company Brief, p. 7; TR. 168. There is a dispute of fact whether the rules were old, new, modified, or a combination of all three. We need not address this point. The questions of bargaining over and enforcement of these rules has been addressed by the NLRB. There is no dispute that new work rules are subject to collective bargaining.

This court need only address whether there is reasonable cause to believe that the Company committed an unfair labor practice in implementing the rules, whether old or new, at the time and in the manner which they did so. We find that the Director has shown that such reasonable cause exists. The policies were reduced to writing and presented to the employees on the Monday morning after the election. They were read aloud and employees were required to acknowledge receipt of

the formal documents. The document contained a warning that discipline up to and including discharge might result from the violation of these policies.

Additionally, the Director offered into evidence an e-mail communicated between management members Paul Barnum and Scott Pearcy indicating that pressroom employees "better follow whatever instructions they're given...Doing otherwise is at the peril of anyone refusing to follow orders." D. 40.

There was evidence of an escalation of discipline for failure to comply with work rules which began immediately after the union vote. Such action suggests intimidation and retaliation against the employees for union support. Thus we find reasonable cause to believe that an act of retaliation occurred, constituting an unfair labor practice. We reach this conclusion regardless of whether any of the rules existed prior to the union vote.

Any unilateral implementation of new work rules or acts of retaliatory discipline would impact the pressroom employees and their work environment, and have the potential to inhibit their Union involvement. We therefore find it just and proper to enjoin the company from employing any such practices.

<u>B.</u>

We reach the same conclusion with respect to the decision to send Nicklaus Recktenwald home for the remainder of his shift on October 31st when his press was inoperable. Prior to the election, employees whose presses were inoperable were permitted to remain at the facility to perform other work. A member of management, Scott Pearcy, stated that the policy of allowing employees to remain and do other work when their presses were down was "lax" prior to the

election, but immediately thereafter, the Company was "tightening up our belt strings a little bit" and implemented the policy of sending employees home on a rotating basis if there were an insufficient number of presses to run. TR. 325.

There was evidence that this was an act of retaliation for his support of the Union, rather than a business decision. Pearcy testified that the decision to send Recktenwald home would not have been "at such a forefront if there'd never been anything about the Union...that definitely precipitated me thinking about how to cut costs and get people out." TR. 329.

As noted in *Hyatt Corp. v. NLRB*, 939 F.2d 361, 372-73 (6th Cir. 1991), "Section 8(a)(1) and (5) of the Act can be violated when, on the heels of a successful Union election, an employer begins to strictly enforce previously existing rules which had not earlier been enforced." We conclude that the decision to send Recktenwald home prior to the end of his shift, contrary to prior practice, could reasonably be seen as an act of retaliation by the Company and so constitute an unfair labor practice which it is just and proper for this court to prohibit.

### C.

The Director claimed that the Company "initiated a policy of disciplining unit employees for production errors" immediately after the election. There was no evidence that this policy was new. The Company adduced evidence that warnings (also referred to as "write-ups") were issued routinely for production errors prior to the election. TR. 1200-1205. The NLRB reached this same conclusion, and the Director has indicated that this challenge has now been abandoned. *(See,* p. 2, fn. 1 of this opinion). The Director has also abandoned the claim that the write-ups of Travis Dykstra on December 14 and 28, 2011 were unlawful. *Id.* However, as the claim concerning the

write-up of Richard Woolsey remains in issue, this court finds it necessary, for purposes of our analysis, to address in totality the matter of post-election disciplining of employees.

1.

Union proponents Travis Dykstra and Richard Woolsey received warnings for production errors, Woolsey on November 3, 2011 and Dykstra on December 28, 2011. Both employees admitted their errors. Apparently, Dykstra had let his press run out of black ink, and Woolsey had put the wrong side of a job on two jobs. TR. 867-870; 1734; 1746-47.

The NLRB found that the production error warning to Dykstra, who had received a similar warning prior to his involvement with the Union, was not unlawful. D. 51. The NLRB found that the write-up of Woolsey on November 3rd did constitute an unfair labor practice, citing Pearcy testimony that a motivation for the warning was to show the Union members that management would no longer maintain a "lackadaisical attitude" about such errors. D. 42.

2.

We are in agreement with the NLRB that there is no reasonable cause to believe that an unfair labor practice occurred with respect to the policy and procedure of disciplining for production errors. As found by the NLRB, "The fact is that the record plainly shows that the [company] has maintained a work rule regarding production errors...[T]he [company] submitted numerous disciplinary reports showing imposition of sanctions for production errors going back as far as February 2009 and continuing through November, 3, 2011." D. 42-43. We do not see a qualitative difference between the write-ups of Dykstra and Woolsey in light of the well-established policy of

disciplining for production errors, we conclude that there is no basis to find an unfair labor practice with respect to the disciplining of employees for production errors.

3.

On December 14, 2011, Dykstra received a disciplinary warning for inappropriate behavior after having sent a text message to co-worker Paris Bradford containing the acronym "WTF."[4] Dykstra had sent the text to Bradford who had apparently left the press in poor condition for the start of Dykstra's shift. Bradford reported the incident and management had the text when he was asked about the incident. TR. 1747. Dykstra did not deny sending the inappropriate text. There was evidence adduced by the Company that prior to the union vote, employees were disciplined for inappropriate behavior including foul language.

4.

With regard to these specific infractions, whether in production or in good judgment, they were admitted by the employees and the Company issued ordinary warnings in response. There is no suggestion that Dykstra or Woolsey were subjected to different treatment than other employees received either before or after the election.

In this court's view, the Director failed to adduce convincing evidence of an improper motivation for these disciplinary actions. The evidence suggested only that the incidents occurred relatively close in time to the election, and that, generally, an anti-union animus persisted at Print Fulfillment. The court will not second guess these management decisions regarding employee

---

[4]It is undisputed that this acronym stands for "what the fuck," and that Bradford understood the use of the abbreviation.

discipline and performance. The court has not been shown reasonable cause to believe that these individual warnings or the overall policy of disciplining employees for production errors constituted unfair labor practices. Injunctive relief will be denied with respect to these allegations.

### D.

Apparently, the flow of business at Print Fulfillment fluctuates throughout the year. In purported anticipation of a work slowdown, the Company prepared to implement a layoff in December of 2011. As a result of the implementation of the Company's layoff plan, Union members Jonathan Bishop, Nicklaus Recktenwald, Robert Starks and William Wellman were laid off.

The Director contends with respect to the plan generally that its unilateral implementation violated Sections 8(a)(1) and (5) of the Act. The Director claimed that the Company failed to bargain in good faith concerning the terms and implementation of the layoff plan.

The Union was notified of the plan, and a candidate list was provided. The Union then suggested its own list of candidates. The Company did not utilize the Union's list in implementing the layoff. The NLRB found that these actions constituted unfair labor practices. It concluded that there was evidence that the Company had no intention to bargain in good faith over these employment issues. Rather, if it agreed to address them with the Union at all, the Company was merely "go[ing] through the motions." D. 59-60. The NLRB ordered the reinstatement of these four employees.

This court concludes that the Director adduced evidence reasonably supporting the contention that the Company did not bargain in good faith. Therefore, we find it appropriate to order

the Company to cease and desist from failing and refusing to bargain in good faith concerning changes in the terms and conditions of employment, as the law clearly requires.

As noted earlier, the Company has apparently afforded the four union members reinstatement. Only Bishop has accepted.

### E.

The Director has also challenged the layoffs of Bishop and Recktenwald as discriminatory, in retaliation for their union adherence.

There was evidence concerning Heap's admittedly hostile attitude toward the Union. There was also evidence of retaliatory conduct after the election by various members of management who implemented company policy. There was further testimony, however, that despite Heap's displeasure with the support for the Union, management understood that they must "follow the law the best we could..." in decisions such as the implementation of the December layoff. TR. 253-54, D. 48.

There was evidence that the selection of candidates for layoff was based primarily on objective production criteria. Indeed, there was testimony that when the list of candidates for layoff was compiled, it was based on a statistical evaluation of productivity and other related factors. There was evidence that the criterion of productivity was of paramount concern for the 2011 layoff plan. The pressroom employees who were laid off were purportedly selected based on employee productivity data.

There was evidence that some management members involved in the formulation of the payoff plan were concerned with following the law, and that candidates were identified purportedly

by objective criteria.  Therefore, the court must find something more than a mere closeness in time to the election, or generalities concerning the desire to rid the company of union supporters to find reasonable cause to believe that the layoff of any individual employee was unlawful.  As aptly stated by the Fifth Circuit in *NLRB v. Birmingham Publishing Co.*, 262 F.2d 2, 9 (5th Cir. 1959),

> If a man has given his employer just cause for his discharge, the Board cannot save him from the consequences by showing that he was prounion and his employer antiunion.  We have no doubt that the Birmingham Publishing Company was glad to get rid of Edwards.  But the Company has a right to operate its plant efficiently.  If an employee is both inefficient and engaged in union activities, that is a coincidence that does not destroy the just cause for his discharge.  We cannot say and the evidence does not support the conclusion that the Board can say:  Edward was fired because the Company's officials had an anti-union animus against Edwards.

There was evidence of prior layoffs in 2008 and 2010, and thus this occurrence was not new.  Testimony concerning the selection of candidates for layoffs in prior years was in conflict.  There was apparently no union activity prior to the 2008 and 2010 layoffs.  Testimony showed that in 2010 the criteria was to lay off the highest paid and least senior operators.  TR. 1541-43.  Matt Murray was laid off in 2010.  Matt Murray was a Union supporter in 2011, but he was not a candidate for layoff under the 2011 productivity criteria.

There was no testimony that the layoff itself was unjustified from a business standpoint.  It was acknowledged that layoffs had occurred in the recent past.  Rather, the Director challenges the layoff selection process as contrived and the timing of the layoff as suspect.  He contends that because Heap was openly hostile toward Union supporters prior to the election and the fact that the layoff occurred a number of weeks after the election, it should be inferred that the listing of any Union supporter for layoff should reasonably be viewed as an act of retaliation.  The court rejects this argument as unsupported by the evidence.  The Director's theory requires the court to disregard the testimony of members of management who testified that their post-election management

decisions were guided by the requirements of the law *despite* Heap's purported agenda. *See, ie.,* TR. 263: "...Paul said that...Brett's not going to be happy about the list, but, you know, we have to follow the law and we have to do what we have to do – what's best for the Company."

The fact that the layoffs occurred within a number of months of the election does not alone support the inference that the layoffs were contrived or particularly targeted at Union adherents. We decline to accept the theory that Heap's pre-election rancor toward pro- Union employees influenced and governed *all* actions subsequently taken by the Company after the Union was voted in. The court finds that the Director paints with too broad a brush in this regard. Rather, we look at the evidence with respect to each alleged labor violation and carefully evaluate the facts.

<u>1.</u>

There is ample evidence that Jonathan Bishop, the union steward, was specifically targeted by Brett Heap, and that Heap "mainly" wanted to fire Bishop. He wanted Bishop "out." TR. 239; 244. In an e-mail, Bishop was characterized by a member of management as a "jackass," and was going to be "the first to go." D. 46-47. Most egregiously, it was announced that Bishop was on the list for layoff, despite that fact that it was known that he "produce[d] more sheets per hour than a couple of pressmen we're retaining..." *Id.* Thus he was not strictly a candidate for layoff under the production criteria established by management. It was noted that he was only able to operate one kind of press, an additional factor outside of the productivity calculus that the company reviewed. However, Bishop was considered to be an "anomaly" and the Company anticipated that his layoff would be challenged by the Union. *Id.* The company removed his name from the list of candidates for layoff after it was purportedly determined that there had been an error in the calculation, and

Bishop was not, in fact, the proper candidate. Robert Roederer was determined to be less productive than Bishop and thus was slated for layoff in his place. Roederer had a wife and child. Bishop was single. Bishop felt that he was "better able to handle" being laid off than Roederer. TR. 1466. Bishop ultimately volunteered to take layoff in Roederer's place.

The court agrees with the conclusion of the NLRB that "[t]here is simply no credible innocent explanation for the decision to announce the layoff of the Union steward. The only reliable evidence as to the motive for this decision is that it was taken in the face of the statistics and for the purpose of effectuating Heap's desire to be rid of Bishop." D. 47. The court concludes that despite the fact that ultimately Bishop was laid off voluntarily, the act of publicly listing him as a candidate in contravention of the stated criteria for layoff suggests retaliation. Coupled with the evidence that Bishop was Heap's "number one target" and evidence of ongoing animosity toward him, the court finds reasonable cause to believe that the identification of Bishop as a candidate for layoff constituted an unfair labor practice.

### 2.

Nicklaus Recktenwald was also laid off. The Director no longer contends that Recktenwald was wrongfully laid off in retaliation for his union activity. The NLRB found that, under the productivity criteria which was admittedly applied across the board to determine which pressroom employees would be laid off, Recktenwald would have been laid off in the absence of any discriminatory animus. The Director has withdrawn the challenge to the layoff of Recktenwald particularly. There is therefore no issue currently before the court concerning the layoff of Recktenwald. But the Director maintains that the layoff plan itself was not properly addressed

through collective bargaining. The NLRB has so found. Therefore, despite a lack of sufficient evidence of retaliation, Recktenwald was found to have been laid off in violation of § 8(a)(5), and thus was subject to interim recall to employment.

## Conclusion

For the reasons set forth herein, the court will enter an order granting injunctive relief in accordance with this opinion. Having concluded that there is reasonable cause to believe that unfair labor practices were engaged in by Print Fulfillment, the court concludes that injunctive relief is necessary to prevent an adverse impact on the members of the newly-formed Union.

Interim relief from this court will afford the bargaining unit protection from possible future unfair labor practices while the Consolidated Complaints remain outstanding. The order will reinforce the mandate that the collective bargaining unit and the rights of its members are to be respected. The court concludes, therefore, that interim injunctive relief is just and proper in this case relief will be granted accordingly.

**IT IS SO ORDERED.**